**UNITED STATES ex rel. Harold R. FINE, Plaintiff,**

v.

**MK–FERGUSON COMPANY and Industrial Contractors Corporation, Defendants.**

**Civ. No. 91–1122 JB.**

United States District Court,
D. New Mexico.

Aug. 29, 1994.

Duff H. Westbrook, Maureen Sanders, Albuquerque, NM, for plaintiff.

Paul Bardacke, Kerry Kiernan, Eaves, Bardacke & Baugh, Albuquerque, NM, for defendant Indus. Contractors Corp.

William P. Snyder, Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, TN, for defendant M–K Ferguson Co.

## MEMORANDUM OPINION AND ORDER

BURCIAGA, Chief Judge.

THIS MATTER came on for a hearing before the Court on July 15, 1994, on Plaintiff's December 21, 1993 motion to strike the affidavit of Walter Perry and Defendants Industrial Contractors Corporation's and MK–Ferguson's August 12, 1993 motions to dismiss. The Court, having reviewed the submissions of the parties, the relevant law, and having heard the arguments of counsel, finds Plaintiff's motion is not well taken and is denied.[1] Defendant Industrial Contractors Corporation's motion is also not well taken and is denied. The Court finds Defendant MK–Ferguson's motion is well taken in part and is granted in part.

---

1. Matters outside the pleadings may be considered in deciding on a motion to dismiss for lack of subject matter jurisdiction. *Village Harbor, Inc. v. United States,* 559 F.2d 247, 249 (5th Cir.1977). The affidavit of Walter Perry conforms to the Federal Rules of Evidence and will therefore be admitted for the limited purpose of determining whether the Court has subject matter jurisdiction over this action.

Harold Fine initiated this *qui tam*[2] action on behalf of the United States Government and himself pursuant to the private enforcement provision of the False Claims Act, 31 U.S.C. § 3730 (1988) ("FCA"). Defendant Industrial Contractors Corporation ("ICC") asserts that present and former employees of any Inspector General's office should be absolutely barred from bringing *qui tam* actions based on information which they received via their employment. Defendant MK–Ferguson ("MK–F") contends that the Court is statutorily barred from asserting jurisdiction over this action because it is based on publicly disclosed transactions and allegations of which the Relator[3] was not an original source.

## I. BACKGROUND

In 1978, Congress passed the Uranium Mill Tailings Radiation Control Act. 42 U.S.C. §§ 7901–7942 (1988). This Act authorized the establishment of the Uranium Mill Tailings Remediation Action ("UMTRA"), a program designed to safely remediate and contain residual mill tailings from uranium mining sites. UMTRA designated 24 sites for remediation. A site in Lakeview, Oregon was among them.

UMTRA directed the United States Department of Energy ("DOE") to enter into cooperative agreements with states containing UMTRA sites. Under these agreements, the DOE is responsible for 90 percent of the costs of remediation; the state is responsible for the remaining 10 percent. The state is authorized to question any of the costs incurred by the DOE.

The State of Oregon and the DOE entered into a UMTRA cooperative agreement. The DOE selected MK–F as the prime contractor responsible for the performance of all engineering and construction activities at the Lakeview UMTRA site. MK–F selected ICC to perform all construction work. The State of Oregon was not a party to either the prime contract between the DOE and MK–F or the subcontract between MK–F and ICC.

Some time after commencing work on the site, MK–F and ICC claimed additional costs, asserting that conditions at the site were not as anticipated. The DOE reimbursed the Defendants for these additional costs. The State of Oregon, however, questioned some of the additional costs claimed by the Defendants, ordered audits of Defendants' records, and sent a report of these contested costs to the DOE. The DOE's subsequent investigation concluded that most of the allegations made by Oregon had been resolved. Oregon, unsatisfied with the DOE investigation, requested that an audit of Defendants' records be performed by the DOE's Inspector General's ("DOE–IG's") Office. The DOE–IG subcontracted the performance of this audit to ADC, Ltd., an independent contracting firm. The Inspector General's Office issued its final report, based on ADC's audit, on April 30, 1991.

The Relator, now treasurer of Bernalillo County, was an employee of the United States Government for 31 years. He served 22 years with the General Accounting Office and nine with the DOE's Inspector General's Office, where he was an assistant manager of the Western Region Audit Office. Between July of 1987 and July of 1991, 84 to 97 percent of the audit reports issued by the Western Region Audit Office came from employees under his supervision. Fine retired in July of 1991, "motivated in part by (his) perception that (his) supervisors ... condoned fraud against the government by 'watering down' reports" and by reporting false claims not as such, but as "unnecessary expenditures," "questioned costs," or "unsupported costs." (Fine Aff. ¶ 5).

While working for the DOE's Inspector General, the Relator was peripherally in-

---

**2.** *Qui tam* comes from the Latin phrase, *"qui tam pro domino rege quam pro si ipso in hac parte sequitur,"* which translates, "who sues on behalf of the King as well as for himself." A *qui tam* action is one to recover a penalty "brought by an informer, under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the remainder to the state...." Black's Law Dictionary 867 (6th ed. 1990).

**3.** In *qui tam* actions, the informer who initiates the action is termed the "relator." The United States of America is technically the Plaintiff.

volved in the audits of the MK–F and ICC cost claims. After retiring, he filed this *qui tam* action under the FCA in November of 1991, alleging that Defendants made false claims against the federal government through their contract to remediate the Lakeview UMTRA site.

## II.  THE FALSE CLAIMS ACT

The False Claims Act is a tool for combatting fraud perpetrated against the United States Government. S.Rep. No. 345, 99th Cong., 2d Sess. 4 1986, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (hereinafter "S.Rep."). It was enacted during the Civil War at the behest of President Abraham Lincoln to control fraud in defense contracts. *Erickson v. Am. Inst. of Bio. Sciences,* 716 F.Supp. 908, 915 (E.D.Va.1989). The original Act made use of the ancient concept of *qui tam* actions, allowing private citizens with knowledge of fraud to sue the perpetrators of the fraud on behalf of the government. Successful relators recovered 50 percent of the awarded damages under the 1863 Act, and the government received the other half. Such was the state of the FCA for the next 80 years.

During World War II, several *qui tam* actions were brought by relators who had no independent or personal knowledge of the fraud which they were alleging, but apparently based their actions on information obtained from criminal indictments brought by the government. Such actions were labeled "parasitic" or "copy-cat" suits. The Supreme Court addressed the legitimacy of such suits in *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). The Court held that such actions were not barred by the statute and that *qui tam* actions may be filed by anyone, regardless of the source of the information forming the basis of the suit. *Id.* at 540–48, 63 S.Ct. at 382–86. The ruling in *Hess* led Congress to amend the *qui tam* provisions of the FCA. The 1943 amendments barred *qui tam* actions based on information which the Government possessed, regardless of whether the Government was actually utilizing the information to prosecute fraud. S.Rep. at 5277.

During the late 1970s and early 1980s, incidents of fraud in government contracts once again became prevalent. A 1981 General Accounting Office study reported that "most fraud goes undetected, [and of] the fraud that is detected, ... the Government prosecutes and recovers its money in only a small percentage of cases." S.Rep. at 5267 (quotation omitted). In 1978, Congress passed the Inspector General Act ("IGA") to combat fraud in government contracts and within government agencies and departments. The IGA created independent IG offices within government departments. These offices are charged with monitoring, investigating, and reporting fraud. *See United States ex rel. Fine v. Univ. of Cal.,* 821 F.Supp. 1356, 1361 (N.D.Cal.1993).

Even after passage of the IGA, Congress felt that there existed "serious roadblocks to obtaining information as well as weaknesses in both investigative and litigative tools" for prosecuting fraud. S.Rep. at 5269. In an attempt to remedy this perceived problem, Congress amended the False Claims Act in 1986 by expanding the scope of *qui tam* actions. The 1986 amendments sought to strike a balance between, on the one hand, encouraging people to come forward with information regarding fraud, and on the other, preventing parasitic lawsuits. The amendments replaced the general jurisdictional bar on *qui tam* actions based on information in the possession of the government with a more specific and less restrictive set of jurisdictional bars. The amended FCA now prohibits courts from asserting jurisdiction over the subject matter of *qui tam* actions which are:

> based upon the *public disclosure* of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an *original source* of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added). 31 U.S.C. § 3730(e)(4)(B) defines the phrase "original source" as "an individual who has direct and independent knowledge of the in-

formation on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."

## III. ANALYSIS

### A. WHETHER INSPECTOR GENERAL EMPLOYEES ARE *PER SE* BARRED FROM BRINGING *QUI TAM* ACTIONS UNDER THE FCA

■ The FCA states that "a person may bring a civil action," 31 U.S.C. § 3730(b)(1), under its provisions. This section has been consistently interpreted to include government employees, so long as they were not specifically barred by other provisions of the Act. *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1501 (11th Cir.1991); *Erickson v. Am. Inst. of Bio. Sciences*, 716 F.Supp. 908, 912–18 (E.D.Va.1989).

Limited caselaw exists on the more specific issue of whether IG employees should be prohibited from bringing *qui tam* actions. The District Court for the Southern District of Florida refused to prohibit a former IG employee from bringing a *qui tam* action based on information he had obtained as an IG employee. *United States v. CAC–Ramsay, Inc.*, 744 F.Supp. 1158, 1159–61 (S.D.Fla.1990). The District Court for the Northern District of California, however, held that IG employees were barred, for policy reasons, from bringing *qui tam* actions under the FCA where "the relevant information was obtained as part of an IG investigation." *United States ex rel. Fine v. Univ. of Cal.*, 821 F.Supp. 1356, 1361 (N.D.Cal.1993).

Section 3730(e) of the Act expressly enumerates certain actions over which no court may assert jurisdiction.[4] Government employees, including IG employees, are not so excluded. These enumerated exclusions should be considered exhaustive. "[E]numeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." *In re Cash Currency Exchange, Inc.*, 762 F.2d 542, 552 (7th Cir.1985) (citation omitted).

The IGA is discussed at some length in the legislative history of the 1986 Amendments to the FCA. *See* S.Rep. at 5269–73. To judicially imply an IG employee jurisdictional bar in the *qui tam* provisions of the FCA would be, in essence, a declaration that Congress failed to consider Inspector General employees as possible *qui tam* relators, and that if Congress had considered them, they would have been compelled to exclude them from the operation of the Act. It is not for this Court to make such assumptions, especially in light of the importance of *qui tam* jurisdiction to the history of the FCA and the attention the IGA received in the legislative history of the 1986 amendments. As the Ninth Circuit wrote, "The new jurisdictional bars were carefully crafted. They were framed by those surely aware of *[Marcus v.] Hess*, its holding that 'any person' means 'any person,' and its declaration that arguments about the limits on suits by informers should be addressed to Congress not the courts." *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1420 (9th Cir.1991).

---

**4.** 31 U.S.C. § 3730(e) **Certain actions barred.**

(1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

(2)(A) No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

. . . .

(3) In no event may a person bring an action under subsection (b) which is based upon allega-

tions or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

. . . .

In its argument, Defendant adopts the position that "it makes no sense to permit government employees who receive salaries for the purpose of uncovering and reporting fraud to collect bounties under the FCA," *United States ex rel. Fine v. Chevron, U.S.A.,* Civ. No. 91–3224 (N.D.Cal.1991), and that to permit such suits is an "absurd result." *United States ex rel. Fine v. Univ. of Cal.,* 821 F.Supp. 1356, 1361 (N.D.Cal.1993). This Court cannot agree.

The concerns motivating Congress to amend the FCA in 1986 were that fraud was rampant, that it was undetected, and that even if detected, it was not prosecuted. S.Rep. at 5267. The legislative history notes the limited success of the IGA, and that "available Department of Justice records show most fraud referrals . . . remain uncollected." *Id.* at 5269. The report further addressed the problem of government employees' unwillingness to report fraud in the belief that nothing would be done to correct the activity even if it was reported. *Id.* at 5270. Allowing IG employees to bring *qui tam* suits certainly addresses this problem of governmental failure to prosecute. Because the federal government must necessarily select, from among numerous allegations of fraud, which to prosecute, allowing IG employees to pursue *qui tam* claims based on information obtained while employed as IG investigators might enhance the government's limited ability to detect and remedy fraud. The premise behind the *qui tam* provisions applies to IG employees as well as to other citizens—if not more so, as IG employees have access to information that most other citizens do not.

Admittedly, the benefits of permitting IG employees to bring *qui tam* suits could be outweighed by potential conflicts of interest. As the court in *Fine* posited, "Allowing IG auditors to reap huge bounties from *qui tam* actions could create serious ethical conflicts and prevent them from fulfilling their employment responsibilities." *Fine,* 821 F.Supp. at 1361. That IG employees might be willing to risk their employment by withholding information, out of greed, for a chance to recover a maximum of 30 percent of a *qui tam* award is a possibility, albeit speculative, which might undermine the effectiveness of the Inspector General's offices. Such concerns, however, are not a valid basis for judicially implying restrictions to the application of the FCA. This concern is more properly addressed to Congress. As the Eleventh Circuit Court of Appeals reasoned, when faced with the more general question of whether any government employees should be able to bring *qui tam* actions:

> [T]he concerns articulated by the United States [that government employees should not be personally rewarded for "parasitical use of information obtained and developed in the course of government employment"] may be legitimate ones, and application of the [FCA] since its 1986 Amendment may have revealed difficulties in the administration of *qui tam* suits, particularly those brought by government employees. Notwithstanding this recognition, however, we are charged only with interpreting the statute before us and not with amending it. . . .

*United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1503–04 (11th Cir.1991) (citations omitted). Because it is the domain of the legislature and not the judiciary to create exceptions to statutory rules, this Court will not prohibit IG employees from bringing otherwise legitimate *qui tam* actions under the FCA.

## B. WHETHER THE RELATOR'S CLAIMS ARE BASED UPON PUBLICLY DISCLOSED INFORMATION OF WHICH THE RELATOR WAS NOT AN ORIGINAL SOURCE

MK–F contends the Relator is barred under section 3730(e)(4) of the FCA from bringing this action. MK–F argues that the Relator's action is based upon allegations and transactions which were publicly disclosed (1) in a draft report of an audit conducted by the State of Oregon, (2) during an investigation by DOE of the costs questioned by the Oregon audit, and (3) by the DOE–IG audit report. MK–F further argues the Relator is not an original source of this publicly disclosed information.

■ The inquiry into whether the Court has jurisdiction under section 3730(e)(4) is a

four-tiered analysis. The Court must determine (1) whether disclosure has occurred in one of the methods listed in section 3730(e)(4); (2) whether the information has been "publicly" disclosed within the meaning of the statute; (3) if so, whether the relator "based" his suit on the public disclosure; and (4) if so, whether the relator is an "original source" of the information in question. *See United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1500 n. 12 (11th Cir.1991), *quoting United States ex rel. Stinson et al. v. Prudential Ins. Co.,* 736 F.Supp. 614, 617 (D.N.J.1990), *aff'd,* 944 F.2d 1149 (3d Cir. 1991).

### 1. Methods of Disclosure

▮ The Eleventh Circuit has held that the list of the methods of public disclosure in section 3730(e)(4) of the statute is exclusive; disclosure by other means will not invoke the bar. *United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1499–1500 (11th Cir. 1991) ("Congress could easily have used 'such as' or 'for example' to indicate that its list was not exhaustive. Because it did not, however, we will not give the statute a broader effect than that which appears in its plain language."). The Court agrees.

Defendant MK–F contends the draft report of the audit conducted by the State of Oregon publicly disclosed transactions or allegations which form the basis of Relator's action. Regardless of the verity of this assertion, such public disclosures will invoke the jurisdictional bar only if it is in one of the forms listed in section 3730(e)(4)(A): "a criminal, civil, or administrative hearing, [or] in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media...." The terms "report" and "audit" are both modified by "congressional, administrative, or Government Accounting Office." Neither the Oregon audit nor the draft of the report of that audit was made by Congress, an

administrative agency, or the Government Accounting Office. Neither, then, can form the basis for invocation of the section 3730(e)(4)(A) jurisdictional bar. The other sources of information at issue in this case derive from reports or investigations of the DOE, however, and therefore fall within one of the listed methods of disclosure.

### 2. "Public" Disclosure

Given that one of the listed methods of disclosure is implicated, the next inquiry is how "publicly" must the information have been disclosed for the jurisdictional bar to apply? The Tenth Circuit is basically silent as to the extent to which given information must have been disclosed so at to bar *qui tam* actions.[5] Other circuits have taken a variety of approaches. The Third Circuit held that information has been publicly disclosed if it "would have been equally available to strangers to the transaction had they chosen to look for it, as it was to the relator." *United States ex rel. Stinson et al. v. Prudential Ins. Co.,* 944 F.2d 1149, 1155–1156 (3d Cir.1991). The First Circuit stated, "[T]he logical reading [of the statute] is that [section 3730(e)(4) ] serves to prohibit courts from hearing *qui tam* actions based on information made available to the public during the course of a government hearing, investigation or audit or from the news media." *United States ex rel. LeBlanc v. Raytheon Co.,* 913 F.2d 17, 20 (1st Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991). The Second Circuit held that allegations are publicly disclosed when they are placed in the "public domain." *United States ex rel. Dick v. Long Island Lighting Co.,* 912 F.2d 13, 18 (2d Cir.1990).

▮ Analysis of the rationale governing these cases, and the purposes underlying the FCA, yields the following principle: aside from disclosures resulting from news media exposure, public disclosure occurs when the government has affirmatively provided to

---

**5.** In *United States ex rel. Precision Co. v. Koch Industries Inc.,* 971 F.2d 548 (10th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993), the only Tenth Circuit case to discuss *qui tam* jurisdiction under the FCA since 1986, the court focused on the "based upon" component of the analysis. The court in

*Precision* seemed to assume, without discussion or analysis, that the allegations and transactions at issue had been publicly disclosed. *Id.* at 552. All that remained of the court's analysis was whether the relator's action was based upon those publicly disclosed allegations or transactions. *Id.* at 552–54.

members of the general public access to information upon which the FCA claim is based. The linchpin of this formulation of the public disclosure test is the requirement that the government perform some affirmative act of disclosure. The mere existence of a report, audit, or investigation containing information pertaining to fraud does not, in and of itself, constitute public disclosure.

The plain meaning of the FCA supports this interpretation. "Disclosure" is modified by "public." 31 U.S.C. § 3730(e)(4)(A). "Disclosure" is defined, in part, as "the act" of disclosing, Webster's Third New International Dictionary 645 (1976), a definition which connotes some positive action taken with the intent to disclose.

Not only does this interpretation comport with the FCA's plain meaning, but it also furthers the Act's purposes and is consistent with its legislative history. "Public disclosure" must mean something more than the mere preparation of documentation regarding fraud. Equating public disclosure with the existence of documentation would be tantamount to barring *qui tam* actions based on information in the possession of the government—exactly the situation Congress was attempting to eliminate in 1986. Not requiring some positive act of disclosure would reinstate the pre–1986 jurisdictional bar based on mere "government knowledge" of information pertaining to fraud. Congress sought to replace this restrictive jurisdictional prerequisite in part because of its concern that the government was not pursuing known instances of fraud. S.Rep. at 5267–69. As a consequence of the government's perceived inability or unwillingness to prosecute fraud, Congress gave private attorneys general greater access to the courts. If the mere existence of a "no action" recommendation buried in an unreleased internal audit report has the effect of foreclosing *qui tam* actions, the 1986 amendments were for naught.

Generally, this affirmative disclosure requirement has significance only in cases where the disclosure is predicated solely on a report, audit, or investigation. A criminal or civil action in state or federal court always constitutes public disclosure. An open administrative hearing would likewise constitute public disclosure. However, an audit, report, or investigation would not constitute public disclosure unless the audit, report or investigation culminated in a civil, criminal, or administrative hearing, was the subject of a news media report, or was meaningfully documented and published or otherwise made available to the public.

Applying these principles to the case at bar, Defendant MK–F argues that the DOE investigation publicly disclosed the allegations at issue. Defendant does not reveal how the investigated information became public, only that MK–F, by providing information and documentation to the DOE, publicly disclosed that information. Defendant relies on *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318 (2nd Cir.1992), in which the court held that interviews of "innocent" employees of the defendant's company, during the execution of a search warrant, constituted public disclosure of fraud allegations to those employees. *Id.* at 322–23. Because some of those employees were "strangers to the fraud," the court reasoned that they constituted "the public" for the purposes of section 3730(e)(4). *Id.* at 322. The questionable reasoning of the *Doe* court aside, the record in this case does not indicate to whom the relevant allegations or transactions were divulged and whether those people were "innocent" or unknowing of the fraud allegations.

From the record, it is difficult to determine the extent to which, if any, the DOE investigation disclosed meaningful information to the public. In any event, it is apparent to the Court that the DOE did not perform any affirmative act of disclosure during the course of its investigation. Therefore, the Court concludes that the DOE investigation was not publicly disclosed within the meaning of the FCA.

Defendant finally claims that the audit performed by the DOE Inspector General's Office and the final report made of that audit publicly disclosed transactions and allegations upon which the Relator's action is based. If the audit report was publicly disclosed, any *qui tam* action based on allegations or transactions reported therein will be

barred under the statute unless the Relator was an original source of this information.

As discussed, the mere preparation of a report by an administrative agency will not constitute public disclosure. However, the report was released to the State of Oregon before this action was commenced, and the Relator conceded in his deposition that once the State of Oregon received the final report of the Inspector General's audit, it became publicly available. Therefore, if any of the Relator's claims are based upon allegations and transactions disclosed in the DOE–IG audit report, they will be subject to the jurisdictional bar of section 3730(e)(4)(A).

### *3. "Based Upon" Public Disclosures*

31 U.S.C. § 3730(e)(4)(A) states that courts will not have jurisdiction over claims based upon publicly disclosed allegations or transactions unless the person bringing the action is an original source of the information. The Relator in this case has alleged wrongdoing by Defendants in six matters under the Lakeview UMTRA contract between the DOE and MK–F and under the subcontract between MK–F and ICC. These matters are as follows:

1. Cost of Waste Water Retention Pond Liner—Relator claims that ICC fraudulently submitted a claim which exceeded the actual cost by $14,690.
2. Winter Shutdown Costs—Relator alleges that ICC had been using equipment at other job sites for which it made fraudulent claims as idle equipment, totalling $127,110.
3. Overhead Costs for Deleted Work—Relator alleges that ICC made fraudulent claims for overhead costs associated with construction of a wood chip cell, which it knew had been deleted from the project, in the amount of $40,168.
4. Construction of the Decontamination Pad—Relator claims that ICC falsely submitted claims totalling $86,009 for reconstruction of the decontamination pad as new work outside of the original contract, when it knew that such work was part of its initial bid.
5. Rental Costs During Winter Shutdown—Relator claims that defendant ICC submitted claims for rental costs based on estimates (65 percent of "Blue Book" costs), when it knew that actual costs were required and that actual costs were much less than 65 percent of the Blue Book costs. (Amount undetermined).
6. Use of Estimated Overhead Rates—Relator alleges that ICC made claims of overhead for contract modifications at a 15 percent rate when it knew the actual costs to be between eight and 13 percent. (Amount undetermined).

The DOE Inspector General's audit questioned the costs of four activities associated with the DOE–MK–F contract and the MK–F–ICC subcontract:

1. The deletion of an unnecessary wood chip encapsulation cell (design costs for item not approved by the State of Oregon and with unearned overhead costs), totalling $44,263;
2. Decontamination pad reconstruction (costs of meeting the subcontract commitments of ICC and which were the responsibility of ICC), for $86,009;
3. Payment of equipment standby costs during the 1987–1988 and 1988–1989 winter periods (costs not allowable against Oregon because total costs exceeded the approved total cost limitation in the DOE–Oregon agreement), for $940,457; and
4. Construction of waste water retention ponds—specifically, water retention pond number three (unreasonable costs supported only by inaccurate, incomplete, and outdated cost data), for $14,690.

The purposes of the audit were to determine if the costs of the four activities were allowable under the terms of the MK–F contract and the DOE–Oregon agreement and incurred under generally accepted business practices.

Of the Relator's six allegations, three were publicly disclosed in the DOE–IG audit. Relator's claim involving the wood chip encapsulation cell is essentially the same as the costs questioned by the audit report. The Relator's claims for costs of reconstruction of the

decontamination pad and the cost of the liner in water detention pond number three are precisely those questioned by the audit report. Relator's actions regarding these costs are therefore based on publicly disclosed allegations. The Court is prevented from adjudicating these claims unless the Relator is an original source of this information.

Both the Relator and the audit report questioned winter shutdown costs. However, the audit report questioned the entire $940,000 cost of winter shutdown, while the Relator's claim only alleges that certain specific costs associated with winter shutdown were fraudulent. Additionally, Relator argues that the audit report did not question the acceptability of the Defendant's claims for winter shutdown costs, but only questioned whether the DOE could seek ten percent of those costs from the State of Oregon because, at the time the claims were made, the cost of the project exceeded the total cost limitation stated in the DOE–Oregon agreement.

Nevertheless, the Relator does make allegations about the permissibility of some of the same costs questioned by the DOE–IG audit report, and therefore the Court must dismiss these claims regarding winter shutdown costs pursuant to *United States ex rel. Precision Co. v. Koch Indus.*, 971 F.2d 548 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993). In that case, the Tenth Circuit ruled that "the threshold 'based upon' analysis is intended to be a quick trigger for the more exacting original source analysis." *Id.* at 552. Therefore, "a plaintiff whose *qui tam* action which is based *in any part* upon publicly disclosed allegations or transactions is subject to the 'original source' jurisdictional requirement." *Id.* at 553 (emphasis added). As the Relator's claims are based in part upon the allegations contained in the DOE–IG report, they are barred by section 3730(e)(4).

Relator's final claim (item 19 of Relator's complaint), that ICC has unreasonably and impermissibly used estimates that were higher than actual costs in billing overhead, when it knew that actual figures were required, has not been addressed in any publicly disclosed document. The jurisdictional bar does not at all apply to this part of the Relator's action.

### 4. *Original Source*

If a relator brings an action under the FCA which is based upon the public disclosure of allegations or transactions, the Court may only assert subject matter jurisdiction over that action if the relator shows that he is an original source of the publicly disclosed information. Section 3730(e)(4)(B) defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." The Relator must demonstrate that he is an original source of the information upon which he bases his claims surrounding the construction of the waste water retention pond, the reconstruction of the decontamination pad, the unearned overhead for the deleted wood chip encapsulation cell, and costs associated with winter shutdowns. These are the only allegations based upon publicly disclosed information.

Under the FCA, an original source must have "direct and independent knowledge of the information" that was publicly disclosed. Some courts have added the requirement that the relator "must have directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based." *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2nd Cir.1990); *see also United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1418 (9th Cir.1992) ("To bring a *qui tam* suit, one must have had a hand in the public disclosure of allegations that are a part of one's suit."). "The paradigmatic 'original source' is a whistleblowing insider[, such as] 'individuals who are close observers or otherwise involved in the fraudulent activity.' Other relators may also qualify if their information results from their own investigations." *United States ex rel. Stinson et al. v. Prudential Ins. Co.*, 944 F.2d 1149, 1161 (3rd Cir.1991), *quoting* S.Rep. at 5269.

This Court agrees with the above reasoning. The purpose of requiring "direct and independent" knowledge of the information

upon which an action is based is to prevent relators from bringing parasitic actions and contributing little or no additional information of value. With regard to the four claims the Relator has made which were publicly disclosed in the DOE–IG audit report, he has contributed no real personal effort or knowledge. His claims basically mimic the allegations made in that audit and in the Oregon audit with which he was familiar. He did not conduct the investigations which led to those publicly disclosed allegations.

Because the Relator did not have direct and independent knowledge of the information upon which his allegations are based, this Court need not consider whether he "voluntarily provided the information to the Government," as is required of an "original source" under section 3730(e)(4)(B).

## IV. CONCLUSION

The Court concludes that nothing in the False Claims Act precludes IG employees from maintaining *qui tam* actions. Additionally, the jurisdictional bar of section 3730(e)(4) does not bar the Relator's claim based on higher than actual overhead costs, an allegation which was not publicly disclosed. The Court, however, may not assert jurisdiction over the Relator's remaining claims because they are based upon allegations publicly disclosed in the DOE–IG audit report.

Wherefore,

**IT IS ORDERED, ADJUDGED AND DECREED** that Defendant ICC's motion to dismiss be, and hereby is, denied.

**IT IS FURTHER ORDERED** that Defendant MK–F's motion to dismiss be, and hereby is, granted in part. The Relator's claims other than item 19 of the complaint are dismissed.

**IT IS FURTHER ORDERED** that Plaintiff's motion to strike the affidavit of Walter Perry be, and hereby is, denied.

**IT IS FURTHER ORDERED** that Defendants' request for attorney's fees be, and hereby is, denied.