UNITED STATES ex rel. Susan
RAMSEYER, Plaintiff–
Appellant,

v.

CENTURY HEALTHCARE CORPORA-
TION; Century Healthcare Development
Corporation, Defendants–Appellees.

No. 94–6299.

United States Court of Appeals,
Tenth Circuit.

July 24, 1996.

Drew Campo and Joseph C. Schubert, Oklahoma City, Oklahoma, for Plaintiff–Appellant.

Michael E. Joseph and Drew D. Webb of McAfee & Taft, Oklahoma City, Oklahoma, for Defendants–Appellees.

Before SEYMOUR, Chief Judge, PORFILIO and EBEL, Circuit Judges.

EBEL, Circuit Judge.

Plaintiff Susan Ramseyer brought this action on behalf of the United States under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b)-(f), to recover a portion of the civil penalties and damages sought from the defendants. Plaintiff also asserted a claim for retaliatory discharge under the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h). The district court dismissed the complaint pursuant to Fed. R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, relying on the "public disclosure" jurisdictional bar of the FCA. 31 U.S.C. § 3730(e)(4). This provision bars *qui tam* suits that are based upon allegations of fraud already publicly disclosed, unless the person bringing the action qualifies as an "original source" of the information. Because we conclude plaintiff's suit was not based upon publicly disclosed information, we reverse the district court's dismissal of plaintiff's *qui tam* claim. However, because plaintiff has alleged no causal connection between her discharge and any conduct in furtherance of her *qui tam* claim, we affirm the dismissal of plaintiff's retaliation claim.

## I.

Plaintiff alleged that from October 1991 to May 1992, she was employed as a consultant to, and then as the clinical director of, a mental health facility operated by the defendants. In those capacities, it was her responsibility to monitor compliance with applicable Medicaid requirements. Plaintiff further alleged that during her employment she became aware of widespread noncompliance with minimum program components for day treatment services at defendants' facility. Although plaintiff regularly communicated the instances of noncompliance to her superiors, the defendants continued to submit noncomplying claims to the government that ultimately were paid by Medicaid.

In the meantime, and completely independent of plaintiff's efforts, a routine audit and inspection conducted by the Oklahoma Department of Human Services ("DHS") revealed deficiencies in the defendants' day treatment program similar to those discovered by plaintiff. As a result of this audit, Roy Hughes, a DHS Programs Supervisor, prepared a report (the "Hughes Report") detailing essentially the same compliance problems that plaintiff had raised. Only three copies of the Hughes Report were made: one copy was given to the DHS programs administrator, a second copy was provided to the defendants, and the third remained in the DHS files. No copies of the Hughes Report were released to the general public, nor was this report available to the public except upon a written request for the specific record and approval from the DHS legal department.

Defendants terminated plaintiff's employment in May 1992. Six months later, plaintiff filed the present lawsuit alleging that the defendants' Medicaid billing practices gave rise to false claims redressable under the FCA. Plaintiff also alleged that her discharge had been in retaliation for her repeated protests over defendants' noncompliance with the applicable Medicaid requirements.

1. The district court dismissed plaintiff's entire complaint, but did not specifically address her retaliation claim, which is not subject to the jurisdictional bar of section 3730(e)(4)(a). We need not remand this issue to the district court, however, as the sufficiency of the allegations

## II.

Plaintiff's suit relies upon the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)-(f), which authorize private individuals, acting on behalf of the United States, to bring a civil action against those who defraud the government. In order to encourage individuals with knowledge of fraudulent activity against the government to come forward, the FCA provides a successful *qui tam* litigant with a cash bounty of up to 30% of the final recovery. *Id.* § 3730(d). However, because Congress sought to achieve "'the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own,'" *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir.1995) (quoting *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 649 (D.C.Cir.1994)), the FCA also erects a jurisdictional bar for suits based upon allegations of fraud that have already been made public. In this regard, the FCA provides that

> [n]o court shall have jurisdiction over an action under this section based upon the *public disclosure* of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added). Applying this statutory provision, the district court concluded that, because plaintiff's lawsuit was based upon publicly disclosed information—specifically, the allegations contained in Hughes Report—it lacked subject matter jurisdiction to entertain the action.[1]

underlying the claim is a legal question, *see Hunt v. Bennett*, 17 F.3d 1263, 1265 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 107, 130 L.Ed.2d 55 (1994), and as such may be resolved on this appeal. *See Griess v. Colorado*, 841 F.2d 1042, 1047 (10th Cir.1988).

## A.

We note at the outset that our review of the district court's dismissal under the FCA jurisdictional bar is plenary. When a court's subject matter jurisdiction is dependent upon the same statute that provides the substantive claim in the case, the jurisdictional question is necessarily intertwined with the merits. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995) (citing *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987)). In a *qui tam* suit brought under the FCA, the jurisdictional issue of "public disclosure" clearly arises out of the same statute that creates the cause of action. *See United States ex rel. Fine v. Advanced Sciences, Inc.*, 879 F.Supp. 1092, 1094 (D.N.M.1995). Thus, a challenge under the FCA jurisdictional bar is necessarily intertwined with the merits. Under our precedent, such "intertwined" jurisdictional questions should be resolved either under Federal Rule of Civil Procedure 12(b)(6), or, after proper conversion into a motion for summary judgment, under Rule 56. *Holt*, 46 F.3d at 1003; *Redmon ex rel. Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir.1991).

In the present case, defendants' motion to dismiss did not simply attack the facial validity of the complaint; rather, it raised a factual challenge to the existence of subject matter jurisdiction. That is, defendants argued that plaintiff's allegations of fraud were based upon publicly disclosed information and in support of this factual claim tendered to the district court evidence outside the pleadings. The district court treated defendants' motion as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). However, because the jurisdictional question was intertwined with the merits, and because the court relied on affidavits and other evidentiary material submitted by the parties, defendants' motion to dismiss should have been treated as one for summary judgment under Rule 56(c). *Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir.1992). Accordingly, we exercise our plenary power and consider the defendants' motion as a motion for summary judgment. *See Redmon*, 934 F.2d at 1155.

We review the grant or denial of summary judgment *de novo*, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). *Universal Money Ctrs., Inc. v. AT & T*, 22 F.3d 1527, 1529 (10th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The determination of subject matter jurisdiction is reviewed *de novo*. *United States ex rel. Precision Co. v. Koch Industries*, 971 F.2d 548, 551 (10th Cir.1992), *cert. denied*, 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993).

## B.

The district court held that because the Hughes Report was available to the general public upon a written request, the "allegations or transactions" therein were "public[ly] disclos[ed]" within the meaning of 31 U.S.C. § 3730(e)(4)(A). On appeal, plaintiff contends that the mere existence of a report that is only "theoretically" or potentially available to the public cannot constitute public disclosure. In plaintiff's view, the public disclosure bar does not come into play here because DHS took no affirmative steps to make the "allegations or transactions" in the Hughes Report publicly known.[2]

2. Section 3730(e)(4)(A) bars only suits that are based upon the public disclosure of "allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media...." Accordingly, it might have been argued by plaintiff here that "[n]either the [state DHS] audit nor the [Hughes Report] was made by Congress, an administrative agency, or the Government Accounting Office ... [and n]either, then, can form the basis for invocation of the section 3730(e)(4)(A) jurisdictional bar." *United States ex rel. Fine v. MK–Ferguson Co.*, 861 F.Supp. 1544, 1550 (D.N.M.1994). We acknowledge this potential argument for the sake of clarity only and do not address it, as plaintiff passed over, and therefore waived, the point. *See Sheets v. Salt Lake County*, 45 F.3d 1383, 1390 (10th Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 74, 133 L.Ed.2d 34 (1995). Our duty to consider unargued *obstacles* to subject matter jurisdiction does not affect our discretion to decline to consider waived arguments that might have *sup-*

■ Since 1986, when Congress amended the FCA to add the public disclosure bar, the Tenth Circuit has not had the occasion to address directly what constitutes "public disclosure" for purposes of section 3730(e)(4)(A). *See United States ex rel. Fine v. MK–Ferguson Co.,* 861 F.Supp. 1544, 1550 (D.N.M.1994) (noting that "[t]he Tenth Circuit is basically silent as to the extent to which given information must have been disclosed so a[s] to bar *qui tam* actions"). Moreover, our sister circuits are divided on the question whether theoretical or potential accessibility—as opposed to actual disclosure—of allegations or transactions is sufficient to bar a *qui tam* suit that is based upon such information. *Compare United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1158 (3d Cir.1991) (information exchanged between private parties through discovery but not filed with the court is "potentially accessible to the public" and thus is publicly disclosed) *with United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512, 1519–20 (9th Cir.1995) (holding that "public disclosure" means actual disclosure rather than potential availability), *petition for cert. filed,* 64 U.S.L.W. 3593 (U.S. Feb. 15, 1996) (No. 95–1340) *and United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 652–53 (D.C.Cir.1994) (expressing doubt that documents revealed during discovery but not filed in court were publicly disclosed, and rejecting view that "public disclosure" includes information that "is only theoretically available upon the public's request").[3] We agree with the District of Columbia and Ninth Circuits that "public disclosure" signifies more than the mere theoretical or potential availability of information. *See also*

*Stinson,* 944 F.2d at 1171 (Scirica, J., dissenting) ("I would focus on actual public disclosure, rather than the general potentiality for public access...."). We believe that in order to be publicly disclosed, the allegations or transactions upon which a *qui tam* suit is based must have been made known to the public through some affirmative act of disclosure.

Our interpretation of "public disclosure" is supported by the common usage and understanding of the term. To "disclose" is commonly defined as "to make known; reveal or uncover." *The Random House College Dictionary* 378 (Rev. ed.1980); *see also Black's Law Dictionary* 464 (6th ed.1990) (defining "disclose" as "[t]o bring into view by uncovering; to expose; to make known"). Thus, a report which is merely *potentially* discoverable—such as through a Freedom of Information Act request, *see Schumer,* 63 F.3d at 1519–20—but not actually "made known" to the public, does not come within the ambit of public disclosure. In order to bar a *qui tam* action under section 3730(e)(4)(A), the allegations or transactions upon which the suit is based must have been affirmatively disclosed to the public. *MK–Ferguson Co.,* 861 F.Supp. at 1551; *cf. Springfield Terminal Ry.,* 14 F.3d at 652 ("public disclosure" occurred when discovery materials not subject to protective order were filed with the court in public litigation).

The "affirmative disclosure" interpretation of the public disclosure bar also coheres with the twin purposes of the FCA: "(1) to encourage private citizens with first-hand knowledge to expose fraud; and (2) to avoid civil actions by opportunists attempting to

---

*ported* such jurisdiction. *Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1539 (10th Cir.1992).

**3.** See also *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1157–58 (2nd Cir.), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993), which held that discovery materials filed in a court's public records file were thereby publicly disclosed. Neither *Schumer* nor *Springfield Terminal Ry.* disagree with that holding in *Kreindler,* and we have no occasion in this case to address that specific factual scenario to determine whether documents placed in a public court file are thereby publicly disclosed, although we note that

all of our sister circuits to address the issue agree with this proposition. *See, e.g., United States v. Northrop Corp.,* 59 F.3d 953, 966 (9th Cir.1995) (noting that " 'every court of appeal to have addressed the question' has held that 'any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure ... for purposes of section 3730(e)(4)(A)' ") (quoting *United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339, 1350 (4th Cir.) (collecting cases), *cert. denied,* —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994)), *cert. denied,* —— U.S. ——, 116 S.Ct. 2550, 135 L.Ed.2d 1069 (1996).

capitalize on public information without seriously contributing to the disclosure of the fraud." *United States ex rel. Precision Co. v. Koch Industries,* 971 F.2d 548, 552 (10th Cir.1992), *cert. denied,* 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993).

As to the second of these purposes, we do not believe that an actual disclosure rule will encourage parasitic lawsuits. Information to which the public has potential access, but which has not actually been released to the public, cannot be the basis of a parasitic lawsuit because the relator must base the *qui tam* suit on information gathered from his or her own investigation. If a specific report detailing instances of fraud is not affirmatively disclosed, but rather is simply ensconced in an obscure government file, an opportunist *qui tam* plaintiff first would have to know of the report's existence in order to request access to it. With regard to such materials, which are at best "only potentially in the public eye," we agree with the District of Columbia Circuit that "no rational purpose is served—and no 'parasitism' deterred—by preventing a *qui tam* plaintiff from bringing suit based on their contents." *Springfield Terminal Ry.,* 14 F.3d at 653.

As to the other purpose of the Act—encouraging the exposure of fraud—the amended *qui tam* provisions seek to ensure that information bearing on potential fraud will come to light even if government officials should decide not to initiate proceedings based on information contained in government files. The previous incarnation of the Act required dismissal of a *qui tam* action once it was determined that "the action is based on evidence or information the Government had when the action was brought." 31 U.S.C. § 3730(b)(4) (1982) (superseded). The 1986 amendments changed the focus of the FCA's jurisdictional bar from information that the government simply had within its files to information or evidence which actually had been disclosed to the public. We agree with the statements made by the United States District Court for the District of New Mexico in *MK–Ferguson Co.:*

> Not requiring some positive act of disclosure would reinstate the pre–1986 jurisdictional bar based on mere "government knowledge" of information pertaining to fraud. Congress sought to replace this restrictive jurisdictional prerequisite in part because of its concern that the government was not pursuing known instances of fraud. As a consequence of the government's perceived inability or unwillingness to prosecute fraud, Congress gave private attorneys general greater access to the courts. If the mere existence of a "no action" recommendation buried in an unreleased internal audit report has the effect of foreclosing *qui tam* actions, the 1986 amendments were for naught.

861 F.Supp. at 1551 (citation omitted). Only when there is a positive act of disclosure to the public can the government "no longer throw a cloak of secrecy" around the allegations, for at that point the information has been "irretrievably released into the public domain." *United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 322 (2d Cir.1992).

Admittedly, the government entity possessing the information in this case was not the federal government, but a state agency, DHS. However, we do not believe this fact undercuts our conclusion that, under the 1986 *qui tam* amendments, the touchstone is actual public disclosure rather than mere knowledge of fraud. Nor do we draw any contrary conclusion from the fact that DHS (or the State of Oklahoma), had it been so inclined, could have beaten plaintiff to the courthouse and filed its own *qui tam* action on behalf of the United States. *See, e.g., United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir.1984) (involving *qui tam* action brought by the State of Wisconsin after its Department of Health and Social Services uncovered instances of Medicaid fraud). While some courts have held that public disclosure occurs when the allegations of fraud are *disclosed* to anyone who is a "stranger to the fraud," *e.g., John Doe Corp.,* 960 F.2d at 322–23, DHS learned of the defendants' alleged fraud not via a disclosure from another person, but through its own independent investigation. Mr. Hughes compiled the Hughes Report in his official capacity as DHS Programs Supervisor, and with the exception of one copy provided to the defendants, all copies of the Hughes Report

were kept within DHS.[4] The mere possession by a person or an entity of information pertaining to fraud, obtained through an independent investigation and not disclosed to others, does not amount to "public disclosure." Rather, public disclosure occurs only when the allegations or fraudulent transactions are affirmatively provided to others not previously informed thereof. *John Doe Corp.*, 960 F.2d at 323 (public disclosure occurs when "allegations of fraud *are revealed* to members of the public with no prior knowledge thereof") (emphasis added).

Applying these principles to the present case, we believe the district court erred in concluding that the plaintiff's *qui tam* action was based upon allegations or transactions already disclosed to the public. Although plaintiff concedes that the allegations in her Complaint are similar to the information contained in the Hughes Report, the mere placement of that report in the DHS files does not constitute public disclosure. Defendants argue that any member of the general public could have obtained a copy of the Hughes Report simply by requesting the documentation relating to DHS's 1991 inspection of the medical facility in question. This argument, of course, presupposes that a member of the public both knew that DHS conducted an inspection in 1991 and understood that the documented findings resulting from that inspection were available for public review upon request. DHS did not affirmatively "disclose" either the existence or the contents of the Hughes Report; instead, DHS simply placed the report in its investigative file and restricted access to those persons clairvoyant enough to specifically ask for it.[5] We cannot agree that such conjectural or speculative "accessibility" to the information bars the plaintiff's *qui tam* action. *See Schumer*, 63 F.3d at 1519–20; *Springfield Terminal Ry.*, 14 F.3d at 652–53.

Allowing plaintiff's lawsuit to proceed is also consistent with Congress' desire to "encourage persons with first-hand knowledge of fraudulent misconduct to report fraud." *Stinson*, 944 F.2d at 1154. It is undisputed that plaintiff possessed first-hand knowledge of her employer's allegedly fraudulent Medicaid billing practices. Moreover, but for plaintiff's lawsuit, defendants' fraudulent activity may have gone undetected because the evidence essentially was "hidden in files." *Id.* at 1161. If the mere existence of a report, as opposed to the actual disclosure of the allegations or transactions contained therein, would operate to bar plaintiff's suit, it would "prevent the utilization for enforcement purposes of allegations or transactions that may not otherwise come to the attention of the authorities." *Springfield Terminal Ry.*, 14 F.3d at 653. *See also MK–Ferguson Co.*, 861 F.Supp. at 1551 ("The mere existence of a report, audit, or investigation containing information pertaining to fraud does not, in and of itself, constitute public disclosure."). Accordingly, we reverse the district

---

4. Even though DHS employees other than Mr. Hughes may have seen or had access to the Hughes Report, we do not believe this constitutes "public disclosure." Because Mr. Hughes drafted the report in the course of his employment with DHS, we view DHS as the entity possessing the information. We do not believe that allegations or transactions which are "disclosed in private" to the employees of a potential relator are thereby publicly disclosed for purposes of section 3730(e)(4)(A). *Cf. Schumer*, 63 F.3d at 1518–19 (disclosure to employees of the defendant does not constitute "public disclosure"); *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1419 (9th Cir. 1991) (disclosure by one federal government employee to another does not constitute "public disclosure").

For obvious reasons, the disclosure of the Hughes Report to the defendants also does not constitute "public disclosure." The defendants, accused with perpetrating the fraud on the government, not only are parties to the alleged fraudulent transactions, but have no incentive to make the information known to the public.

5. Mr. Hughes himself described in an affidavit the difficulty a member of the public would have in obtaining a copy of his report. First, Mr. Hughes stated that a third-party request for the report "would have to be approved by the Legal Division for DHS...." Hughes Aff. ¶5, Appellant App. at 351. Second, Mr. Hughes opined that "[g]iven the vast number of records maintained by the DHS Medical Services Division, and the inability of the general public to see these records, without a written request for a specific record, approved by the Legal Department, it is extremely doubtful that a member of the general public could gain access to a copy of the [Hughes] Report without already knowing of its contents and existence." *Id.* ¶6, Appellant App. at 351.

**1522**

court's order dismissing plaintiff's action for lack of subject matter jurisdiction.[6]

## III.

■ Plaintiff also seeks redress under the anti-retaliation provision of the FCA, which reads in pertinent part:

> Any employee who is discharged ... because of lawful acts done ... *in furtherance of an action under this section,* including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.... An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h) (emphasis added). While the district court did not expressly address plaintiff's retaliation claim, defendants offer two legal rationales to justify the district court's *sub silencio* dismissal of the retaliation claim—one going to the jurisdictional basis of the claim, and the other to the sufficiency of its supporting allegations. *See generally Robinson v. Robinson (In re Robinson),* 921 F.2d 252, 253 (10th Cir.1990) ("An appellee may defend the judgment won below on any ground supported by the record....").

■ Defendants first assert that if the court lacks jurisdiction to entertain plaintiff's *qui tam* action under section 3730(e)(4)(A), plaintiff likewise cannot maintain a retaliation claim under section 3730(h). We have already concluded that plaintiff's *qui tam* claim is not barred for lack of jurisdiction and thus defendants' premise fails. Accordingly, we need not address that issue further, except to note that the case law is clear that a retaliation claim can be maintained even if no FCA action is ultimately successful or even filed. *See, e.g., Neal v. Honeywell, Inc.,* 33 F.3d 860, 864–65 (7th Cir.1994); *Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d

948, 951 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S. Ct. 1110, 130 L.Ed.2d 1075 (1995); *Clemes v. Del Norte County Unified Sch. Dist.,* 843 F.Supp. 583, 595–96 (N.D.Cal. 1994).

■ Defendant's second rationale for dismissal is that plaintiff's amended complaint does not state a claim for relief under section 3730(h) because it alleges no connection between plaintiff's discharge and any conduct in furtherance of a *qui tam* or governmental FCA action. We emphasize that an individual need not actually file a *qui tam* action in order to maintain a claim under section 3730(h), *see Neal,* 33 F.3d at 865; *Clemes* 843 F.Supp. at 595. However, we agree that under the plain language of the statute, the activity prompting plaintiff's discharge must have been taken "in furtherance of" an FCA enforcement action. *See Robertson,* 32 F.3d at 950 (holding that a claim under section 3730(h) requires discharge in retaliation for actions taken "in an effort to bring, or to help the government bring, a False Claims Act suit").

■ When seeking legal redress for retaliatory discharge under the FCA, plaintiff has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government. *Robertson,* 32 F.3d at 951 ("[A] whistleblower must show the employer had knowledge the employee engaged in 'protected activity.'") (quotation omitted). If defendants were not afforded such notice, then, *a fortiori,* their actions could not constitute retaliation. Thus, our inquiry in the present case is whether the actions alleged in the complaint could be reasonably described as an "investigation" sufficient to put defendants on notice of a possible *qui tam* action.

The amended complaint states that plaintiff monitored a day treatment program and regularly communicated to her superiors

6. Because we hold that the "allegations or transactions" upon which plaintiff's action was based were not publicly disclosed, we need not address the question whether plaintiff was an "original source of the information" for purposes of 31 U.S.C. § 3730(e)(4)(A). *See Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir.1992) ("Where there has been no 'public disclosure' within the meaning of section 3730(e)(4)(A), there is no need for a *qui tam* plaintiff to show that he is the 'original source' of the information.").

"[i]nformation regarding non-compliance with the required minimum program components." Appellant App. at 55–56. However, this does not rise to an allegation that plaintiff performed either an "investigation for," or provided "assistance in," this or any other FCA action. 31 U.S.C. § 3730(h). The amended complaint also documents plaintiff's internal protests regarding the "shortcomings" in the patient records. *Id.* at 57. While we acknowledge that intracorporate complaints may fall within the protective scope of section 3730(h), *see Robertson,* 32 F.3d at 951 (collecting cases sustaining FCA retaliation claims brought by internal whistleblowers), we do not believe plaintiff has satisfied her burden of pleading facts which would put defendants on notice that she was taking any action in furtherance of an FCA action.

 The amended complaint alleges only that plaintiff advised her superiors that defendants were not complying with the minimum program requirements of Medicaid. Yet plaintiff never suggested to defendants that she intended to utilize such noncompliance in furtherance of an FCA action. Plaintiff gave no suggestion that she was going to report such noncompliance to government officials, *cf. Clemes,* 843 F.Supp. at 596; *Neal,* 33 F.3d at 861, nor did she provide any indication that she was contemplating her own *qui tam* action. Rather, the monitoring and reporting activities described in plaintiff's complaint were exactly those activities plaintiff was required to undertake in fulfillment of her job duties, and plaintiff took no steps to put defendants on notice that she was acting "in furtherance of" an FCA action—*e.g.,* that she was furthering or intending to further an FCA action rather than merely warning the defendants of the consequences of their conduct. *See Robertson,* 32 F.3d at 951–52 (contract administrator's in-

vestigation into overcharging was part of employee's job and could not have put employer on notice); *X Corp. v. Doe,* 816 F.Supp. 1086, 1095–96 (E.D.Va.1993) (lawyer's discussion of employer's potential *qui tam* liability was part of his job and, because lawyer did not indicate that he might bring such an action, employer was not on notice).[7] We therefore hold that plaintiff's amended complaint fails to state a claim for retaliatory discharge under 31 U.S.C. § 3730(h). Since plaintiff has never sought leave to pursue further amendment of her pleadings in light of the deficiency identified by defendants, and nothing presented in the briefs on appeal suggests corrective amendment would be possible in any event, we affirm the outright dismissal of this claim. *See generally Glenn v. First Nat'l Bank,* 868 F.2d 368, 372 (10th Cir.1989).[8]

## IV.

For the foregoing reasons, we AFFIRM the dismissal of plaintiff's FCA retaliation claim. However, we REVERSE the district court's order dismissing plaintiff's *qui tam* action for lack of subject matter jurisdiction, and REMAND for further proceedings consistent with this opinion.

---

7. Our citation to these cases should not be read to suggest that an individual whose job entails the investigation of fraud is automatically precluded from bringing a section 3730(h) action. However, we do note that such persons must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations.

8. Perhaps anticipating our rejection of her FCA retaliation claim, plaintiff alternatively requests that we treat the retaliation claim as a pendent state law public policy tort based upon *Burk v. K–Mart Corp.,* 770 P.2d 24 (Okla.1989). We decline to do so, however, as plaintiff's complaint failed to invoke the court's supplemental jurisdiction under 28 U.S.C. § 1367.