PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 11/6/96**

TENTH CIRCUIT

UNITED STATES OF AMERICA,
*ex rel*., HAROLD R. FINE,

    Plaintiff-Appellant/
    Cross-Appellee,

v.

MK- FERGUSON COMPANY, a
Morrison Knudsen Company;
INDUSTRIAL CONRACTORS;
MORRISON KNUDSEN
CORPORATION, doing business as
MK-Corporation Operations,

    Defendants-Appellees/
    Cross-Appellants.

No. 95-2011
No. 95-2021

UNITED STATES OF AMERICA,

    Amicus Curiae.

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-91-1122 JB/LFG)

Duff H. Westbrook of Duff H. Westbrook, P.C., Albuquerque, New Mexico,
(Maureen A. Sanders, Albuquerque, New Mexico, with him on the brief) for
Plaintiff-Appellant/Cross-Appellee.

Paul Bardacke (Kerry C. Kiernan and Peter S. Kierst with him on the briefs) of Eaves, Bardacke & Baugh, P.A., Albuquerque, New Mexico, for Defendant-Appellee/Cross-Appellant Industrial Contractors Corporation.

William P. Snyder (John C. Burgin, Jr., with him on the brief) of Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, Tennessee, for Defendant-Appellee/Cross-Appellant MK-Ferguson Company.

Michael F. Hertz (Barbara C. Biddle, Joan E. Hartman, and Dara A. Corrigan with him on the brief), Attorneys, Civil Division, U.S. Department of Justice, Washington, D.C., for *Amicus Curiae*.

Before **HENRY**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

This case arises under the False Claims Act, 31 U.S.C. §§ 3729-33, and specifically the *qui tam* provisions that allow individuals to sue on behalf of the government to recover federal monies lost as a result of false claims and fraudulent charges. The individual bringing the *qui tam* suit, called a relator, shares a percentage of any proceeds recovered. *Id*. § 3730(d).

The False Claims Act contains jurisdictional limits on those who may bring *qui tam* actions. It bars all *qui tam* suits that are based upon publicly disclosed information unless the person bringing the action is an original source of the information. *Id*. § 3730(e)(4)(A). The primary questions presented in this appeal are whether the relator's suit is based upon a "public disclosure" under section

3730(e)(4)(A) and, if so, whether the relator qualifies as an "original source" under section 3730(e)(4)(B).

Harold R. Fine is a former employee of the Office of the Inspector General, U.S. Department of Energy. He brought suit as the relator under the *qui tam* provisions of the False Claims Act against defendants MK-Ferguson Company ("MK-Ferguson") and Industrial Contractors Corporation ("Industrial Contractors"). Fine's Complaint alleges that these firms submitted false and fraudulent claims with respect to six matters involved in the remediation of residual mill tailings at a uranium mining site in Lakeview, Oregon.

The district court granted in part MK-Ferguson's motion to dismiss on the ground it lacked subject matter jurisdiction. The district court held that Fine's Complaint was based upon publicly disclosed allegations and that Fine was not an original source of these allegations.[1] *United States ex rel. Fine v. MK-Ferguson Co.*, 861 F. Supp. 1544, 1552, 1554 (D.N.M 1994). This appeal followed the district court's dismissal and its denial of the defendants' motions for attorneys'

---

[1]The district court also denied Industrial Contractors' motion for summary judgment against Fine. The motion was premised on an implied jurisdictional bar to *qui tam* suits by employees of the Office of the Inspector General. Industrial Contractors appeals the denial of its motion and is joined by *amicus curiae*, the United States of America. Because Fine's suit is barred under the jurisdictional requirements of the False Claims Act, 31 U.S.C. § 3730(e)(4), this court specifically does not address the district court's ruling that there is no implied jurisdictional bar to employees of the Office of the Inspector General filing suit under the *qui tam* provisions of the False Claims Act.

fees.  Appellate jurisdiction exists pursuant to 28 U.S.C. § 1291.  For the reasons set forth below, this court affirms the district court's rulings that Fine's suit is based on a public disclosure, that he does not qualify as an original source, and that an award of attorneys' fees to MK-Ferguson and Industrial Contractors is not appropriate.

I.

Fine alleges false claims and fraudulent charges in the construction of facilities for the remediation of residual mill tailings at a uranium mining site in Lakeview, Oregon.  In 1978, Congress enacted the Uranium Mill Tailings Radiation Control Act (the "Uranium Tailings Act"), Pub. L. No. 95-604, 92 Stat. 3021 (codified as amended at 42 U.S.C. §§ 7901-42), to stabilize and control mill tailings from uranium mining operations in several western states.  42 U.S.C. § 7901.  The Uranium Tailings Act directs the United States Department of Energy to enter into cooperative remediation agreements with states which have designated cleanup sites.  *Id*. § 7913.  Under these agreements, the Department of Energy is responsible for 90% of the costs of the remediation, while the state is responsible for the remaining 10%.  *Id*. §§ 7913, 7917.

The State of Oregon and the Department of Energy entered into a cooperative agreement concerning the Lakeview, Oregon, site.  The Department of Energy then entered into a contract with MK-Ferguson as the prime contractor

-4-

for all engineering and construction work at the Lakeview site. MK-Ferguson in turn entered into a subcontract with Industrial Contractors for all the construction work at the site. Oregon is not a party to either the prime contract between the Department of Energy and MK-Ferguson or the subcontract between MK-Ferguson and Industrial Contractors.

After commencing work at the site in June 1986, MK-Ferguson and Industrial Contractors claimed additional construction costs, explaining that site conditions were not as anticipated. Oregon, however, questioned whether some of these new costs were allowable under the contract between the Department of Energy and MK-Ferguson and the subcontract between MK-Ferguson and Industrial Contractors. Oregon conducted three separate audits on the Lakeview site and sent an audit report on the contested costs to the Department of Energy. The Oregon report focused on four cost areas: (1) unabsorbed overhead paid to Industrial Contractors when a wood-chip encapsulation cell for contaminated organic material was deleted from the project; (2) costs for work on a waste-water retention pond; (3) costs for reconstructing pads used to decontaminate trucks operated on the site and on public roads; and (4) costs associated with winter shutdowns.

As a result of the Oregon audit report, the Department of Energy undertook an investigation into the questioned costs and activities. Following a lengthy

investigation by the Department of Energy, Oregon requested that an audit be performed by the Department of Energy's Office of the Inspector General. The Office of the Inspector General subcontracted the audit to ADC, Ltd., an independent firm. ADC performed the audit, wrote a draft report, and submitted it to the Office of the Inspector General.

On April 30, 1991, the Office of the Inspector General then issued a final report and audit based on ADC's audit. The final report and audit was intended to determine whether the costs of the questioned activities were: (1) allowable under the contract between the Department of Energy and MK-Ferguson, the subcontract between MK-Ferguson and Industrial Contractors, or the Uranium Tailings Act cooperative agreement between the Department of Energy and Oregon; and (2) incurred under generally accepted business practices.

The final report and audit concluded as follows: (1) that $40,168 of unearned overhead for the wood-chip encapsulation cell was unallowable under the cooperative agreement; (2) that the entire cost of the decontamination pad, $86,009, was unallowable under the subcontract between MK-Ferguson and Industrial Contractors; (3) that Oregon had a valid claim for its share of the costs of equipment standby during the winter shutdowns; and (4) that part of the cost of constructing the third waste-water retention pond, $14,690, was unreasonable.

The Department of Energy sent this final report and audit to both Oregon and MK-Ferguson officials under cover of a letter dated May 3, 1991. The cover page of the final report and audit contained no special restrictions on its availability, referring only to the general procedure for determining the release of audit reports pursuant to requests under the Freedom of Information Act. In addition, the cover letter neither imposed limitations on the public availability of the report nor restrained in any way its dissemination by Oregon.

At the time of these events, Fine was an Assistant Regional Manager, Western Region, in the Office of the Inspector General for the U.S. Department of Energy. Fine had held this position since August 1984 and was in charge of financial-related audits. Fine performed no audit work himself; rather, he supervised audit directors who in turn supervised auditors performing the actual, on-site audit work.

Fine had no involvement in the Department of Energy's initial investigation of the questioned costs at the Lakeview site and was only marginally involved in the audit ordered by the Office of the Inspector General and performed by ADC. Fine's involvement was limited to: (1) attending a preaudit conference; (2) authorizing the original direction to ADC; and (3) later helping to draft the final report and audit based on the ADC audit. Fine described his involvement at the

drafting stage as converting the ADC audit into layman's language. In addition, Fine later solicited information about the alleged fraud through newspaper ads.

Fine left the Office of the Inspector General and government service on July 18, 1991. Four months later, he filed this suit in the United States District Court for the District of New Mexico under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-33. In his Complaint, Fine alleges that MK-Ferguson and Industrial Contractors submitted false and fraudulent claims for cost reimbursement relating to work performed at the Lakeview site. Fine alleges wrongdoing in six different matters: (1) alleged excess costs relating to the waste-water retention pond liner, totaling $14,690; (2) costs associated with winter shutdowns for idle equipment allegedly used at other sites, totaling $127,110; (3) overhead costs for the deleted wood-chip cell, totaling $40,168; (4) reconstruction costs for the decontamination pad, totaling $86,009; (5) use of estimated rather than actual costs for equipment associated with the winter shutdowns; and (6) use of estimated rather than actual overhead rates for contract modifications. With the exception of item (6), which was ultimately dismissed with prejudice at Fine's request, each of Fine's claims of wrongdoing was addressed in the April 30, 1991, Inspector General's final report and audit.

As required by the False Claims Act, Fine filed his Complaint under seal. 31 U.S.C. § 3730(b)(2). The Complaint remained under seal while the U.S.

Department of Justice considered its option to intervene. *See id.* The Department

of Justice declined to intervene and the litigation proceeded with Fine the sole

protagonist.

MK-Ferguson filed a motion to dismiss which the district court granted in

part. *MK-Ferguson*, 861 F. Supp. at 1554. The district court resolved that counts

1-18 of Fine's Complaint, which encompass all allegations of wrongdoing

excepting only that concerning the use of estimated overhead rates for contract

modifications, were based upon the Inspector General's final report and audit. *Id.*

at 1552-53. The court then concluded that the final report and audit was a public

disclosure under the False Claims Act upon its referral to the State of Oregon. *Id.*

at 1552. The district court rejected MK-Ferguson's claims that any of the three

Oregon audits, the Oregon audit report issued to the Department of Energy, or the

Department of Energy investigation constituted a public disclosure under the

False Claims Act. *Id.* at 1550-52.

Continuing its analysis, the district court also held that Fine was not an

original source under 31 U.S.C. § 3730(e)(4)(B). *MK-Ferguson*, 861 F. Supp. at

1553-54. Because Fine did not conduct any of his own investigations and his

knowledge was based upon the audit prepared by ADC for the Inspector General,

the district court concluded that Fine could not be considered to have "direct and

independent knowledge" of the information upon which his Complaint was based. *MK-Ferguson*, 861 F. Supp. at 1554.

At Fine's request, the district court dismissed with prejudice his remaining claim regarding the use of estimates on contract modifications. Fine filed this appeal presenting the following issues: (1) whether the Inspector General's release of the final report and audit to Oregon is a public disclosure under the False Claims Act; (2) whether his Complaint is "based upon any public disclosure"; (3) whether the allegations regarding specific transactions not contained in the Inspector General final report and audit can be dismissed; and, if this court concludes that a public disclosure has occurred, (4) whether Fine qualifies as an original source under the False Claims Act. MK-Ferguson and Industrial Contractors cross-appeal the district court's denial of their motions for attorneys' fees.

## II.

The statutory provisions of 31 U.S.C. § 3730(e)(4) address the court's subject matter jurisdiction. When a court's subject matter jurisdiction depends upon the same statute that creates the substantive claims, the jurisdictional inquiry is necessarily intertwined with the merits. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). In a *qui tam* action under the False Claims Act, the jurisdictional question of whether a "public disclosure" has occurred arises out of

the same statute that creates the cause of action. *United States ex rel. Ramseyer v. Century Healthcare Corp.*, No. 94-6299, 1996 WL 412819, at \*2 (10th Cir. July 24, 1996). This court has determined that these "intertwined" jurisdictional inquiries should be resolved under Federal Rule of Civil Procedure 12(b)(6) or, after proper conversion into a motion for summary judgment, under Rule 56. *Id.* The district court here resolved MK-Ferguson's motion to dismiss under Rule 12(b)(1). The district court should have treated MK-Ferguson's attack on the court's subject matter jurisdiction as a motion for summary judgment under Rule 56. *Id.* Accordingly, we exercise our plenary power and consider the motion as a motion for summary judgment. *Id.*

We review the grant of summary judgment *de novo*, applying the same legal standard that would be used by the district court pursuant to Rule 56(c). *Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1529 (10th Cir.), *cert. denied*, — U.S. —, 115 S. Ct. 655 (1994). This court reviews the district court's dismissal for lack of subject matter jurisdiction *de novo*. *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 551 (10th Cir. 1992), *cert. denied*, 507 U.S. 951 (1993).

Federal courts are courts of limited jurisdiction. A court's jurisdiction is therefore presumed not to exist absent a showing by the party invoking federal jurisdiction. *Precision*, 971 F.2d at 551; *Penteco Corp. v. Union Gas Sys. Inc.*,

-11-

929 F.2d 1519, 1521 (10th Cir. 1991). Moreover, "statutes conferring jurisdiction on federal courts are to be strictly construed, and doubts resolved against federal jurisdiction." *F&S Constr. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). As this court noted in *Precision*, the False Claims Act should not be read in a manner that impermissibly expands federal jurisdiction. 971 F.2d at 552. Fine thus bears the burden of alleging facts essential to jurisdiction and supporting those facts by competent proof. *Id.* at 551.

The False Claims Act imposes the following jurisdictional requirements at issue here:

> (e) Certain actions barred.—
>
> . . . .
>
> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730.

-12-

Given the posture of this case, the jurisdictional inquiry under 31 U.S.C. § 3730(e)(4)(A) involves four questions: (1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act; (3) whether the relator's complaint is "based upon" this "public disclosure"; and, if so, (4) whether the relator qualifies as an "original source" under section 3730(e)(4)(B). If the court were to answer "no" to any of the first three questions, its inquiry ends at that point and the *qui tam* action proceeds. The last inquiry, whether the relator is an original source, is necessary only if the answers to each of the first three questions is "yes," indicating the relator's complaint is based upon a specified public disclosure. *See Precision*, 971 F.2d at 552 & n.2.

Here, as MK-Ferguson argues, the alleged public disclosure is the final report and audit of the Office of the Inspector General, which is an administrative report specifically referenced in 31 U.S.C. § 3730(e)(4)(A). The first of the threshold inquiries thus commands an affirmative response. As a consequence, the court must address the next inquiry.

A. "Public Disclosure"

The district court concluded that a public disclosure occurred when the Department of Energy sent the final report and audit of the Office of the Inspector

-13-

General to the State of Oregon. *MK-Ferguson*, 861 F. Supp. at 1552. But, as the district court noted, when the form of disclosure at issue is an administrative report, the question of whether the report has been publicly disclosed is not as clear as the instance when the government holds a public hearing and airs the allegations or transactions at issue. *Id.* at 1550-51. The district court concluded the False Claims Act contained an affirmative disclosure requirement—the allegations or transactions must somehow be made known to the public. *Id.* at 1551.

In *Ramseyer*, this court reasoned as the district court below. Plaintiff Ramseyer alleged she became aware of the defendants' submission of false claims for Medicaid reimbursement while employed at defendants' mental health facility. *United States ex rel. Ramseyer v.Century Healthcare Corp.*, No. 94-6299, 1996 WL 412819, at *1 (10th Cir. July 24, 1996). Independent of the plaintiff, the Oklahoma Department of Human Services conducted an inspection and audit of the defendants' facilities. *Id.* A subsequent report detailed the same Medicaid compliance problems discovered by the plaintiff. *Id.* Three copies of the report were made: two remained within the government agency's files and the third was sent to the defendants. *Id.* From these facts, this court determined that public disclosure had not occurred. *Id.* at *6.

En route to reaching its decision, the court interpreted the False Claims Act to contain an "affirmative disclosure" requirement. *Id.* at *4. On the basis of this actual disclosure rule, the court rejected the argument that the existence of the report in the files of the Oklahoma government agency constituted public disclosure. *Id.* at *5. The court reasoned that to bar *qui tam* suits because of mere potential public disclosure was contrary to the purposes of the False Claims Act. *Id.* at *4. Furthermore, the court rejected arguments that actions taken by Oklahoma personnel were public disclosures. It determined that any disclosure of the report from one employee of the Oklahoma Department of Human Services to another employee did not constitute public disclosure. *Id.* at *5 n.4. The court also concluded that disclosure of the report to the defendants in the *qui tam* suit was not public disclosure. *Id.* Rather, public disclosure occurs when the allegations or fraudulent transactions upon which the *qui tam* suit is based are affirmatively disclosed to members of the public who are otherwise strangers to the fraud. *Id.* at *5.

Here, the Department of Energy sent the final report and audit of the Office of the Inspector General to the State of Oregon. When the Department of Energy sent this final report and audit to Oregon, it placed no restrictions on its dissemination after Oregon's receipt. As a consequence, this disclosure is distinct from what might otherwise be deemed a private disclosure. *See id.* at *5 n.4.

Fine nevertheless argues that the final report and audit in the hands of Oregon constituted mere potential availability, not public disclosure. In so arguing, Fine seeks to soften his own deposition testimony and to rely upon a purported designation by the Office of the Inspector General of the final report and audit as a document not to be released to the public. These points miss the real target.

Regardless of any purported internal limitation on circulation, the Office of the Inspector General indisputably circulated the final report and audit to Oregon. Oregon was not a party to the questioned contracts and projects. Oregon was thus a stranger to the fraud like any other member of the public, with no disincentive to making the information public. *See id.* Fine himself testified that to the extent of his knowledge, the final report and audit was available to the public once it was sent to Oregon. Moreover, he has come forward with no evidence to indicate there was any limitation on Oregon's releasing the final report and audit to the public.

Any internal limitation on dissemination within the Office of the Inspector General or external limitation under the Freedom of Information Act are inapplicable to the State of Oregon. The cover letter sent to Oregon enclosing the final report and audit contained no limitations or conditions on Oregon's power to release it. Once the Department of Energy sent the final report and audit to

Oregon without restrictions on its public availability, the government caused the final report and audit to be actually, as opposed to potentially, available to the public. This was an affirmative disclosure constituting public disclosure within the meaning of the False Claims Act. Consequently, Fine's Complaint mandates further inquiry.

## B. "Based Upon"

The next required inquiry is whether Fine's Complaint is "based upon" the publicly disclosed "allegations or transactions": the final report and audit sent to Oregon. *Precision*, 971 F.2d at 552-54. "Based upon," in 31 U.S.C. § 3730(e)(4)(A), means "supported by." *Precision*, 971 F.2d at 552. The test is whether "substantial identity" exists between the publicly disclosed allegations and the *qui tam* complaint. *Id*. at 553-54. The False Claims Act can thus bar a *qui tam* action that is only partly based upon publicly disclosed allegations or transactions. *Id*. at 552. Moreover, this "based upon" analysis is a threshold inquiry "intended as a quick trigger" to reach the "original source" analysis. *Id*.

This analysis requires comparison of the publicly disclosed final report and audit with the allegations contained in Fine's Complaint. The final report and audit disclosed to Oregon by the Department of Energy questioned costs relating to four different construction activities at the Lakeview site: the deleted wood-chip encapsulation cell, the reconstructed decontamination pad, the equipment

-17-

standby costs during the winter shutdowns, and the construction of the third waste-water retention pond. The final report and audit concluded that costs for the wood-chip cell, the decontamination pad, and waste-water pond were unallowable and that Oregon had a valid claim for reimbursement of the winter standby costs.

The parts of Fine's Complaint at issue here concern five cost areas: the waste-water retention pond liner, the deleted wood-chip encapsulation cell, the reconstruction of the decontamination pad, the use of equipment at other job sites claimed to be idle during the winter standby, and the use of estimates, rather than actual costs, for winter standby equipment rentals.

The first three referenced allegations in Fine's Complaint are substantially identical to the costs relating to these projects questioned and found to be unallowable in the final report and audit. In fact, Fine's allegations concerning these specific items are for the exact dollar amounts found to be unallowable in the final report and audit sent to Oregon. As a result, these three allegations are "based upon" the publicly disclosed final report and audit and are thus subject to the jurisdictional bar.

The other two areas where Fine alleges fraud, both relating to specific winter standby costs, are also based upon the publicly disclosed final report and audit. Nevertheless, Fine makes three arguments why his Complaint is not based

upon the public disclosure: (1) he became aware of the alleged fraud prior to the public disclosure; (2) his Complaint contains more specific allegations than the public disclosure; and (3) his Complaint is the first time "allegations" of fraud are made. As a result, Fine maintains his Complaint is not subject to the jurisdictional bar. These arguments are unpersuasive.

Fine's first contention seeks adoption of the "derived from" standard applied by the Fourth Circuit in *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1349 (4th Cir.), *cert. denied*, — U.S. —, 115 S. Ct. 316 (1994). He premises his argument on his involvement in the Lakeview site audit prior to the public disclosure: his Complaint was based on that prior involvement and thus could not be "derived from" the public disclosure.

Fine fundamentally misconstrues the nature of the "based upon" analysis laid out in *Precision*: "based upon" means "supported by." *Precision*, 971 F.2d at 552. The inquiry is whether the relator's complaint is "substantially identical" to the allegations contained in the public disclosure. *Id*. at 553-54. This approach is consistent with the goal of Congress in the False Claims Act to encourage those with knowledge of fraud to come forward. *See* S. Rep. No. 345, 99th Cong., 2d Sess. 2, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266. But where public disclosure of the fraud has already occurred, no incentive for a private *qui tam* suit is needed. *See United States ex rel. Stinson, Lyons, Gerlin &*

*Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1155-56 (3d Cir. 1991) (holding that section 3730(e)(4) prevents *qui tam* suits based upon information that would have been equally available to others had they chosen to look for it); *see also United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2d Cir. 1992) (holding that where public disclosure has occurred, the district court is stripped of jurisdiction over the suit, regardless of where the relator obtained the information, unless the relator qualifies as an original source).

Fine's second argument concerns the specificity of his Complaint compared to the specificity of the public disclosure. His contention is really twofold: (1) the Complaint contains allegations of fraud in specific transactions not mentioned in the public disclosure; and (2) the Complaint alleges fraud concerning only part of the winter standby costs questioned and found to be unallowable in the final report and audit.

In *Precision*, this court rejected the argument that the jurisdictional bar applies only to those suits based "solely" upon the public disclosure. 971 F.2d at 552. This court concluded that the addition of the word "solely" to section 3730(e)(4)(A) would dramatically alter the plain meaning of the False Claims Act by greatly expanding federal jurisdiction. *Id.* This court reasoned that such a judicial gloss would only encourage artful pleading by relators, who would add extra claims not supported by the public disclosure to avoid the jurisdictional bar.

*Id*. The resultant pleading niceties would allow relators to benefit from publicly disclosed allegations or transactions for which they were not the original source.

Regarding the winter shutdown costs, Fine attempts to escape the operation of the jurisdictional bar by alleging fraud concerning less than all the amounts found to be unallowable in the publicly disclosed final report and audit. Although his allegations are more narrow and specific in scope, they are substantially identical to and supported by the publicly disclosed allegations and transactions. As a consequence, the winter shutdown cost allegations are factually, legally, and truly based upon the publicly disclosed final report and audit.

Lastly, Fine argues that his Complaint is not "based upon" the publicly disclosed final report and audit because it does not contain allegations of fraud or fraudulent transactions. Fine focuses on the conclusions of the final report and audit, which are worded in terms of "unallowable" or "unreasonable" costs, and contends these conclusions do not constitute allegations of fraud. He maintains his Complaint constitutes the first allegations of fraud.

Comparing the conclusions of the final report and audit concerning unreasonable and unallowable costs with the allegations in Fine's Complaint, we hold that the two are substantially identical. *See Precision*, 971 F.2d at 553-54. The final report and audit concludes that certain cost items exceeded reasonable amounts by specific dollar amounts. Fine's Complaint does the same, with the

semantic difference that he calls these amounts false claims. That Fine first used the label "false claims" is immaterial. The district court was thus correct in its conclusion that Fine's Complaint was based upon publicly disclosed allegations and that Fine was then subject to the original source inquiry.

## C. "Original Source"

Even though a *qui tam* filing may be based upon a statutorily defined public disclosure, it is not jurisdictionally barred if the relator is an original source. The requirements for original sources are set out in 31 U.S.C. § 3730(e)(4)(B). The False Claims Act provides that an original source is an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing a *qui tam* action based on the information. *Id.* This court in *Precision* determined that two jurisdictional requirements are evident in this language. First, the *qui tam* relator must have "direct and independent knowledge of the information on which the allegations are based." *Precision*, 971 F.2d at 553. Second, the *qui tam* relator must have "voluntarily provided" the information to the government prior to filing suit. *Id.*

Other courts have held that direct and independent knowledge is "'marked by [the] absence of an intervening agency.'" *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir.

1991) (quoting Webster's Third New Int'l Dictionary 640 (1976)).  Furthermore, the Ninth Circuit characterizes direct and independent knowledge as "unmediated by anything but [the relator's] own labor."  *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1417 (9th Cir. 1992).  Moreover, independent knowledge is knowledge which is not secondhand knowledge.  *See Prudential*, 944 F.2d at 1154 (holding Congress intended "to encourage persons with first-hand knowledge of fraudulent misconduct to report fraud").

Fine argues that his participation in the audit of the Lakeview site qualifies him as an original source under section 3730(e)(4)(B).  Fine contends that he was the individual who directed the scope of the audit conducted by ADC, Ltd.; that he was the individual who identified the use of equipment rental cost estimates as a false claim, rather than merely an unallowable cost; and that he was the individual responsible for referring reports of MK-Ferguson's and Industrial Contractors' activities to the Investigations Division at the Office of the Inspector General.[2]

---

[2]Fine also argues that he is an original source because of his participation in making the public disclosure.  The Second Circuit requires the original source to be involved in the public disclosure.  *See United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir. 1990).  Fine maintains that the Ninth Circuit has gone a step further and held that participation in the public disclosure is itself solely sufficient to establish that the individual is an original source.  We, however, are skeptical of Fine's reading of Ninth Circuit precedent. *See United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir. 1992) (holding that an individual who is involved in disclosing an allegation

But Fine also admits that he was not the individual actually performing the investigations on the Lakeview site. The audit was instead carried out by field investigators at ADC, which was retained by the Office of the Inspector General. Fine himself had no contact with Oregon personnel involved in the Lakeview project and little with MK-Ferguson employees. Fine acknowledges that all the factual information in his Complaint came from ADC personnel and materials. He concedes that his contribution to the final report and audit produced by the Office of the Inspector General was limited to taking the facts presented by ADC and writing the report in layman's language. Finally, Fine admits that his independent investigations consisted solely of placing ads in newspapers soliciting information from those with knowledge of fraud.

Fine's allegations are derivative of the facts uncovered by the field auditors. He did not himself discover the allegedly fraudulent practices at the Lakeview site and was not an observer of the purported fraud. Fine has merely changed the labels "unreasonable" and "unallowable" costs from the final report

---

"might qualify as its original source"). More importantly, this court in *Precision* declined to adopt the Second Circuit's additional requirement that the original source be a source to the entity making the public disclosure. *United States ex rel. Precision Co. v. Koch Indus, Inc.*, 971 F.2d 548, 553 n.4 (10th Cir. 1992), *cert. denied*, 507 U.S. 951 (1993). Even acknowledging Fine's role in making the public disclosure, because this court concludes below that Fine's knowledge is not direct and independent, he cannot be an original source under the False Claims Act.

and audit to "false" and "fraudulent" claims in his Complaint. Moreover, his own investigations are only a continuation of the audit conducted by ADC and cannot be considered independent under section 3730(e)(4)(B). *See Precision*, 971 F.2d at 554 (holding that an investigation which was merely a continuation of, or derived from, a previous investigation was not sufficiently independent).

That Fine had some involvement in preparing the final report and audit of the Office of the Inspector General does not necessarily qualify him as an original source. Fine's secondhand knowledge of the alleged fraud at the Lakeview site is not "direct and independent," based as it is on the work of others. Fine's suit is the type of opportunistic suit, where the relator contributes no significant information of his own, that Congress sought to discourage in the 1986 Amendments to the False Claims Act. *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995). For these reasons, Fine does not have "direct and independent knowledge" of the publicly disclosed allegations and transactions upon which his Complaint is based and he cannot be an original source.[3] The district court thus lacked subject matter jurisdiction under section 3730(e)(4) and the Complaint was properly dismissed.

---

[3]Because Fine fails to satisfy the "direct and independent knowledge" element of the "original source" analysis, this court need not consider whether Fine "voluntarily provided" this information to the government as required under section 3730(e)(4)(B). *See Precision*, 971 F.2d at 554.

III.

Both MK-Ferguson and Industrial Contractors cross-appeal the district court's denial of their motions for attorneys' fees. *See MK-Ferguson*, 861 F. Supp. at 1554. This court reviews the entitlement to attorneys' fees subject to an abuse of discretion standard. *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir. 1986). Under the abuse of discretion standard, the decision of a trial court will not be disturbed unless the appellate court "has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994) (citation and internal quotation marks omitted).

The False Claims Act provides for the award of attorneys' fees where the claim was "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." 31 U.S.C. § 3730(d)(4). MK-Ferguson and Industrial Contractors advance two main reasons for assessing their attorneys' fees against Fine. First, they argue that the district court so clearly lacked subject matter jurisdiction that Fine's suit constitutes frivolous and vexatious litigation. Second, they argue that Fine has engaged in a pattern of vexatious litigation against a number of government contractors.

Although they are accumulating in number, decisions construing the False Claims Act in the Tenth Circuit are not legion. That the district court lacked

subject matter jurisdiction in this case was not clearly apparent under the holding in *Precision* or the decisions of other circuits at the time. The district court determined that an award of attorneys' fees was not appropriate. This court cannot conclude that the district court's denial of attorneys' fees constituted a clear error of judgment or exceeded the bounds of permissible choice. As a consequence, the district court did not abuse its discretion and this court will not disturb the denial of attorneys's fees. *See Moothart*, 21 F.3d at 1504.

IV.

The district court correctly dismissed Fine's Complaint for lack of subject matter jurisdiction under 31 U.S.C. § 3730(e)(4). It did not abuse its discretion in denying an award of attorneys' fees to the cross-appellants. The judgment of the district court is therefore **AFFIRMED** in all respects.

**Nos. 95-2011 & 95-2021, <u>United States ex rel. Fine v. MK- Ferguson Co.</u>**

**HENRY**, Circuit Judge, dissenting.


I respectfully dissent.

Qui tam actions have been described by some not generally favorable to them as follows:

> The term ["qui tam"] derives from the Latin phrase "*qui tam pro domino rege quam pro se imposo sequitur*," meaning "he who brings the action as well for the king as himself." The original idea was simple: where an entity has defrauded the federal government, a private party should be able to bring suit against the malefactor and share in the government's recovery . . . .

James T. Blanch et al., <u>Citizen Suits and Qui Tam Actions</u> 4 (Roger Clegg & James L.J. Nuzzo eds., 1996).

It is not surprising that qui tam suits would develop nor is it surprising that they may work. A society such as ours surely understands market motivations. When the government--through inattention or because of overtaxed investigative and prosecutorial resources--cannot or does not attempt to recover for fraud, qui tam actions allow private citizens to bring claims on behalf of the government and share in any bounty recovered.

But what the Congress giveth, some of the courts seem to taketh away. The various circuits have adopted different rules covering the four-part test which must be met to provide federal qui tam jurisdiction. The test, as related by the majority, is as follows:

> (1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act; (3) whether the relator's complaint is "based upon" this "public disclosure"; and, if so, (4) whether the relator qualifies as an "original source" under section 3730(e)(4)(B).

Slip op. at 13.

My difference with the majority results from its application of <u>United States ex rel. Ramseyer v. Century Healthcare Corp.</u>, 90 F.3d 1514 (10th Cir.1996), to the facts at hand. <u>Ramseyer</u> takes a practical approach that recognizes Congress's intent to create a workable system to uncover fraud against the government. The qui tam provisions of the False Claims Act must both "'encourage private citizens with first-hand knowledge [of fraud] to expose [it]'" while at the same time "'avoid civil actions by opportunists attempting to capitalize on public information without seriously contributing to the disclosure of the fraud.'" <u>Ramseyer</u>, 90 F.3d at 1519-20 (quoting <u>United States ex rel. Precision Co. v. Koch Indus.</u>, 971 F.2d 548, 552 (10th Cir. 1992), <u>cert. denied</u>, 507 U.S. 951 (1993)). The dual purposes of qui tam noted in <u>Ramseyer</u>, 90 F.3d at 1519-20, and <u>Precision</u>, 971 F.2d at 552, must be balanced against each other. I believe <u>Ramseyer</u> struck the proper balance in the following passage:

> As to the second of these purposes, we do not believe that an actual disclosure rule will encourage parasitic lawsuits. Information to which the public has potential access, but which has not actually been released to the public, cannot be the basis of a parasitic lawsuit because the relator must base the qui tam suit on information

> gathered from his or her own investigation.  Underline{If a specific report detailing instances of fraud is not affirmatively disclosed, but rather is simply ensconced in an obscure government file, an opportunist qui tam plaintiff first would have to know of the report's existence in order to request access to it.  With regard to such materials, which are at best "only potentially in the public eye," we agree with the District of Columbia Circuit that "no rational purpose is served--and no 'parasitism' deterred--by preventing a qui tam plaintiff from bringing suit based on their contents."}

Ramseyer, 90 F.3d at 1520 (quoting United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645, 653 (D.C. Cir. 1994) (emphasis added)).

In striving to reach the proper balance, the majority concludes that the disclosure of the audit report to the state of Oregon amounts to a "public disclosure" under 31 U.S.C. § 3730(e)(4)(A).  I believe this result is in error for two reasons:  first, I believe Ramseyer's logic suggests that the mere disclosure from a federal agency to a state government may not always amount to a public disclosure; and second, though the state of Oregon was not a party to the contract between the Department of Energy and MK-Ferguson Company, it had prior knowledge of the fraud and was liable for ten percent of the ultimate cost of the fraud, and hence was not, in Ramseyer's terms, "'a stranger to the fraud.'"  See Ramseyer, 90 F.3d at 1520 (quoting United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 322-23 (2d Cir. 1992)).

My first point, that the Department of Energy's providing the audit report to the state of Oregon is not a public disclosure follows directly from Ramseyer:

"Only when there is a positive act of disclosure to the public can the government 'no longer throw a cloak of secrecy' around the allegations, for at that point the information has been 'irretrievably released into the public domain.'" 90 F.3d at 1520 (quoting John Doe Corp., 960 F.2d at 322). As Ramseyer noted, not requiring a positive act of disclosure would reinstate the pre-1986 jurisdictional bar of qui tam actions "'based on evidence or information the Government had when the action was brought.'" Id. (quoting 39 U.S.C. § 3730(b)(4) (1982) (superseded)). "Congress sought to replace this restrictive jurisdictional prerequisite in part because of its concern that the government was not pursuing known instances of fraud." Id. (quoting United States ex rel. Fine v. MK-Ferguson Co., 861 F. Supp. 1544, 1551 (D. N.M. 1994)). Thus, Ramseyer concluded that the mere accessibility to a report in government files by the general public via a Freedom of Information Act request does not constitute a public disclosure for the purposes of federal qui tam jurisdiction.

Merely, providing the state of Oregon with a lengthy audit report is likewise not a public disclosure. In this matter, the state of Oregon has entered into an agreement with the United States government through the Department of Energy to clean up the Lakeview site. Although the audit did not state any restrictions on its dissemination, there is no evidence that the state of Oregon took positive steps to release it to the public nor is there any reason to believe that

-4-

other correspondence between the federal agency and the state government concerning their partnership was actively made public. The mere fact that the state of Oregon has the audit report in a file cabinet somewhere subject to public disclosure under the state "Public Records Act," see Org. Rev. Stat. § 192.410-.505, does not constitute an affirmative disclosure to the public. These materials are "at best 'only potentially in the public eye.'" See Ramseyer, 90 F.3d at 1520 (quoting Springfield Terminal Ry., 14 F.3d at 653).

Finally, the second point: Ramseyer suggests the disclosure must be to some member of the public with no prior knowledge of the fraud. The majority characterizes Oregon as "a stranger to the fraud." Slip. op. at 16 (citing Ramseyer, 90 F.3d at 1520 (quoting John Doe Corp., 960 F.2d at 322-23)). I believe that the facts suggest that the state of Oregon had prior knowledge of the alleged fraud and moreover, is no stranger thereto. Oregon conducted three separate audits of its own after questioning some of the additional costs claimed by MK-Ferguson under its contract with the Department of Energy. It was Oregon's audits that instigated the Department of Energy investigation resulting in the federal audit report, which the majority holds was "publicly disclosed" through its transfer to the state of Oregon. Furthermore, Oregon has entered into a agreement as prescribed by the Uranium Mill Tailings Radiation Control Act, Pub. L. No. 95-604, 92 Stat. 3021 (1978) (codified as amended at 42 U.S.C. §§

7901-42 (1995)), whereby it is responsible for ten percent of the costs of remediation at designated cites, including the Lakeview site that MK-Ferguson was hired to cleanup. Although MK-Ferguson's contract was with the Department of Energy and the state of Oregon was not a party thereto, to the extent MK-Ferguson has defrauded the Department of Energy through false claims under the contract, the state of Oregon is ultimately responsible for ten percent of the additional costs. Thus, to my mind, Oregon had prior knowledge of the fraud and was not a stranger to the effects of the fraud.

Although scholars have challenged the constitutionality of qui tam actions, that question is not presented in this case. Though the statute may need to be revised, see Blanch et al., supra, at 5 (noting "that a more straightforward 'bounty' system, without a role for the whistleblower in actually conducting a lawsuit, would address these constitutional concerns [arising from qui tam suits]"), qui tam actions now exist as a sometimes effective tool aimed at diminishing fraud against the federal government and its taxpayers. Judicial constructions should not overly limit this Congressionally provided tool. As I believe Ramseyer supports the conclusion that the mere providing of an audit report to a state government, which has instigated the audit, does not constitute a public disclosure, I would allow Mr. Fine's qui tam suit to proceed.